UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

JONATHAN MARCUS, On Behalf of Himself
and All Others Similarly Situated

            Plaintiff,

     v.

SPIRIT AIRLINES, INC., EDWARD M.
CHRISTIE, III, CARLTON D. DONAWAY,
MARK B. DUNKERLEY, H. MCINTYRE
GARDNER, ROBERT D. JOHNSON,
BARCLAY G. JONES III, CHRISTINE P.
RICHARDS, MYRNA M. SOTO, and DAWN
M. ZIER.

            Defendants.

Case No. 1:22-cv-03911

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**<u>JURY TRIAL DEMANDED</u>**

      Plaintiff Jonathan Marcus ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to himself and his own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by his attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

## <u>NATURE OF THE ACTION</u>

     1.    This action is brought by Plaintiff on behalf of himself and the Class (as defined below) against Spirit Airlines, Inc. ("Spirit" or the "Company") and the members of the Company's Board (the "Board" or the "Spirit Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. §

240.14a-9(a) ("Rule 14a-9"). Plaintiff's claims arise in connection with the solicitation of Spirit's public shareholders ("Spirit Shareholders") to vote in favor of a merger ("Merger") pursuant to which Spirit will survive as a wholly-owned subsidiary of Frontier Group Holdings, Inc. ("Frontier"), in exchange for payment by Frontier to Spirit Shareholders of (i) $2.13 per share in cash ("Cash Portion"), and (ii) 1.9126 shares of Frontier common stock ("Share Portion," and together with the "Cash Portion," the "Merger Consideration").

2.      The Chairman of Frontier's board of directors is William A. Franke ("Franke"), the managing partner of Indigo Partners LLC ("Indigo"), which through an affiliate is Frontier's largest shareholder with 82.4% ownership of Frontier's common stock. From July 2006 through August 2013, Franke was chairman of the Spirit Board, and Indigo was one of Spirit's largest shareholders. Franke resigned from the Spirit Board in August 2013, and in December 2013, he became Chairman of Frontier's board of directors.

3.      On February 7, 2022, Spirit announced that the Board had approved the Merger pursuant to a merger agreement ("Merger Agreement").

4.      On May 11, 2022, Defendants authorized the filing of a false and misleading definitive proxy statement on Schedule 14A ("Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, with the aim of soliciting Spirit Shareholders to vote for the Merger and certain related proposals.

5.      The Proxy contains material misrepresentations and omissions, including but not limited to failing to disclose (i) that the principal negotiators of the Merger on the Spirit side—as well as a majority of the Spirit Board— had served alongside Franke when Franke was chairman of the Spirit Board, and Indigo was one of Spirit's largest shareholders; and (ii) a material lending relationship between Frontier and the Board's financial advisor, Barclays Capital Inc.

("Barclays"). These and other material misrepresentations and omissions render the Proxy false and misleading in violation of the above-referenced Exchange Act provisions and Rule 14a-9.

6.     The Proxy advises that a special meeting of Spirit Shareholders will be held on June 10, 2022, to vote on the Merger and certain related proposals ("Shareholder Vote"). The violations referenced above must be cured in advance of the Shareholder Vote to enable Spirit Shareholders to cast informed votes with respect to the Merger. Therefore, Plaintiff seeks to enjoin the Defendant from taking any further steps to consummate the Merger and schedule the Shareholder Vote, until such violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover damages suffered by himself and similarly-situated investors as a result of such violations.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

8.     This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at

*23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

9.      Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, the Company's common stock trades under the ticker "SAVE" on The New York Stock Exchange, which is headquartered in this District, and the false and misleading Proxy was filed with the SEC, which has a regional office in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

## PARTIES

10.      Plaintiff is, and has been at all relevant times, a continuous stockholder of Spirit common stock.

11.      Defendant Spirit is a Delaware corporation with its principal executive offices located at 2800 Executive Way, Miramar, Florida 33025. Like Frontier, Spirit is an ultra low-cost carrier, or ULCC, that offers customers unbundled base fares that remove components traditionally included in the price of an airline ticket (such as checked and carry-on bags, advance seat assignments, priority boarding and refreshment), and offers them to customers at additional cost at their discretion.

12.      Defendant Edward M. Christie III ("Christie") has been a member of the Board since January 2018 and has served as President and Chief Executive Officer of Spirit since January

2019. Prior to that, Christie served as Spirit's President from October 2018 to December 2018, and as Spirit's President and Chief Financial Officer from January 2018 to October 2018. From January 2017 to December 2017, Christie served as Spirit's Executive Vice President and Chief Financial Officer. From April 2012 to December 2016, Christie served as Spirit's Senior Vice President and Chief Financial Officer. As noted, from July 2006 to August 2013, Franke was Spirit's largest shareholder (through Indigo) and served as chairman of Spirit's Board, and thus Christie's tenure as Spirit's CFO overlapped with Franke's chairmanship and substantial ownership of Spirit.

13.     Defendant H. McIntyre Gardner ("Gardner") has been a member of the Board since July 2010, and thus his tenure at Spirit overlapped with that of Franke. In August 2013, Gardner replaced Franke as Chairman of the Spirit Board.

14.     Defendant Robert D. Johnson ("Johnson") has been a member of the Board since July 2010, and thus his tenure at Spirit overlapped with that of Franke.

15.     Defendant Barclay G. Jones III ("Jones") has been a member of the Board since 2006, and thus his tenure at Spirit overlapped with that of Franke.

16.     Defendant Carlton D. Donaway ("Donaway") has been a member of the Board since January 2013, and thus his tenure at Spirit overlapped with that of Franke. On March 20, 2022, Donaway informed the Company that he will not stand for reelection at the Company's 2022 annual meeting.

17.     Defendant Mark B. Dunkerley ("Dunkerley") has been a member of the Board since September 2019.

18.     Defendant Christine P. Richards ("Richards") has been a member of the Board since September 2019.

19.     Defendant Myrna M. Soto ("Soto") has been a member of the Board since March

5

2016.

20.     Defendant Dawn M. Zier ("Zier") has been a member of the Board since June 2015.

21.     Defendants identified in paragraphs 12 to 20 are collectively referred to herein as the "Individual Defendants," and together with Spirit, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background to the Merger

22.     Between November 2016 and August 2018, Spirit and Frontier periodically explored the possibility of a business combination involving the two companies. Spirit and Frontier entered into a non-disclosure agreement ("NDA") on November 15, 2016, in connection with discussions between the parties held at such time regarding a potential business combination, which agreement expired by its terms in November 2017. On April 9, 2018, Spirit and Frontier entered into a new NDA in connection with renewed discussions regarding a potential business combination. The NDA dated April 9, 2018 expired on April 9, 2019.

23.     On March 31, 2021, Frontier priced its initial public offering ("IPO") of 34.5 million shares of its common stock listed on Nasdaq, which began trading on April 1, 2021, at $19/share.

24.     On June 8, 2021, Franke sent an email to Defendant Christie, Spirit's CEO, and Thomas C. Canfield, Spirit's Senior Vice President and General Counsel (in which positions Canfield has served since October 2007, when Franke was still Chairman of the Spirit Board). Franke suggested an in-person meeting in Fort Lauderdale, Florida. At that meeting (held on July 8, 2021), Franke suggested that Spirit and Frontier consider reopening discussions of a potential business combination.

25.     Christie discussed his meeting with Franke with the Board, and on October 18,

6

2021, Christie emailed Franke that the Board had authorized further discussions regarding a potential business combination with Frontier.

26.     Spirit had previously retained (i) Barclays to serve as financial advisor to the Board with respect to pursuing strategic alternatives for Spirit, including a possible sale of Spirit, pursuant to an engagement letter dated November 21, 2019, and (ii) Morgan Stanley & Co. LLC ("Morgan Stanley") to act as financial advisor to the Board with respect to pursuing strategic alternatives for Spirit, including a possible sale of Spirit, pursuant to an engagement letter dated December 17, 2019.

27.     On November 3, 2021, members of Spirit management met by video conference with representatives of Barclays and Morgan Stanley to discuss financial overviews of Frontier and Spirit, and potential next steps. Thereafter, both Barclays and Morgan Stanley were actively involved in evaluating the merits of a deal with Frontier, and negotiating the terms of the Merger.

28.     On November 9, 2021, the Board and members of Spirit's senior management discussed the potential business combination with Frontier. Representatives of Barclays and Morgan Stanley, and representatives of Spirit's legal advisor, Debevoise & Plimpton LLP ("Debevoise"), participated in that meeting.

29.     On November 10, 2021, representatives of Morgan Stanley emailed Franke to advise that the Board had discussed the potential business combination with Frontier and suggested an in-person meeting later in the month between Franke and Defendants Christie and Gardner, the Chairman of the Spirit Board. Thereafter, Christie and Gardner served as the principal negotiators of the terms of the Merger with Franke via multiple in-person meetings, telephone calls and email exchanges to pin down, among other things, (i) the composition and chairmanship of the board of directors of the combined company, (ii) the CEO of the combined company; (iii) the division of

the percentage ownership of combined company between Spirit and Frontier Shareholders, (iv) the payment of cash consideration to Spirit Shareholders, and (v) the branding of the combined company.

30.     On January 5, 2022, with the parties close to reaching agreement on the material terms of the Merger, Gardner called Franke to "express appreciation for the work undertaken on the Indigo side and the outcome of the parties' discussions which, he stated, would result in a transaction with significant benefits to both companies . . . and reconfirm[] the Spirit board of directors' support for continuing to work to finalize the transaction."

31.     On January 7, 2022, Spirit and Frontier entered into an NDA, which contained a customary standstill provision, to facilitate the exchange of confidential information in connection with further evaluation of the proposed transaction. In the meantime, Christie continued to interact with Franke in an effort to finalize the material terms of the Merger while the parties' advisors began negotiating the financial and legal terms of the Merger Agreement.

32.     On February 1, 2022, Christie and Canfield held discussions with Franke and his son, Brian Franke (an Indigo executive and member of the Frontier board of directors) regarding various terms of the Merger Agreement, including the termination fee. Thereafter, Brian Franke had additional calls with Christie and/or Canfield.

33.     On February 5, 2022, Barclays and Morgan Stanley orally rendered their respective fairness opinions (which were subsequently confirmed in writing) to the Board that the Merger Consideration was fair from a financial point of view to Spirit Shareholders.

34.     On February 7, 2022, Spirit and Frontier announced the Merger.

**The JetBlue Proposal**

35.     On March 29, 2022, Spirit received an unsolicited proposal from JetBlue Airways Corporation ("JetBlue") to acquire all of the outstanding shares of Spirit common stock in an all-cash transaction at a price of $33.00 per share (the "JetBlue Proposal"), which proposal was subsequently provided to Frontier in accordance with the terms of the Merger Agreement.

36.     On April 1, 2022, Debevoise called Frontier's legal advisor, Latham & Watkins ("Latham") to ask whether Frontier was willing to waive the requirement under the Merger Agreement that the Spirit Board determine that the JetBlue Proposal constitutes or could reasonably be likely to lead to a "Superior Proposal" (as defined in the Merger Agreement) before entering into discussions with JetBlue. Later that day, Latham informed Debevoise that Frontier was not willing to waive the requirement.

37.     On April 7, 2022, after consultation with its financial and legal advisors, the Board determined that the JetBlue Proposal could reasonably be likely to lead to a "Superior Proposal" (as defined in the Merger Agreement). Thereafter, Spirit and JetBlue entered into a confidentiality agreement, and commenced discussions regarding the JetBlue Proposal.

38.     Between April 9, 2022 and April 20, 2022, Spirit's and JetBlue's legal advisors conducted seven calls and video conferences, and engaged with economic consultants and economists in order to assess the regulatory risk of an acquisition of Spirit by JetBlue and to assess the validity and merits of JetBlue's own analysis.

39.     Meanwhile, on April 13, 2022, Frontier and Spirit received second requests for information from the Department of Justice in connection with the Merger.

40.     On April 14, 2022, Christie and Franke had lunch together in Phoenix, Arizona, which purportedly had been scheduled in mid-March prior to the JetBlue Proposal, but purportedly

did not discuss either the JetBlue Proposal or the Merger between Spirit and Frontier during their lunch.

41.     On April 15, 2022, Spirit provided JetBlue and its representatives with access to a virtual data room containing due diligence materials for Spirit.

42.     On April 24, 2022, the Board instructed Spirit's senior management to communicate to JetBlue a package of contractual protections that the Board considered appropriate to provide increased assurance as to the likelihood of regulatory approval of the JetBlue Proposal and to protect Spirit and its shareholders against the risk that such approval would not be obtained, which included a covenant to take all actions necessary to obtain regulatory approval, including being willing to terminate JetBlue's Northeast Alliance Agreement ("NEA") with American Airlines and make any divestitures necessary to obtain regulatory approval, and a significant reverse termination fee payable in the event that such regulatory approval ultimately was not obtained. The Board also instructed Spirit's senior management to inform JetBlue that, in the event that Spirit ultimately concluded that the JetBlue Proposal, as it might be amended, constituted a Superior Proposal, Spirit would expect JetBlue to fund the termination fee payable to Frontier upon termination of the Merger Agreement with Frontier.

43.     On April 29, 2022, JetBlue sent Spirit a letter responding to Spirit's proposed package of contractual protections to address the purported regulatory risks inherent in the JetBlue Proposal, along with a draft of a merger agreement between JetBlue and Spirit. In that response, JetBlue offered (i) to pay a reverse termination fee of $200 million if antitrust approval was not obtained, (ii) to use its reasonable best efforts to obtain regulatory approval subject to various limitations, including that JetBlue would not be required to take any action that in its sole and absolute discretion would be reasonably likely to materially and adversely affect the anticipated

benefits of JetBlue or American Airlines under the NEA or that would have a material adverse effect on Spirit or JetBlue when measured relative to a company of Spirit's size, and (iii) to fund the termination fee payable to Frontier upon termination of the Frontier Merger Agreement.

44.    After considering JetBlue's response, and further deliberations, the Board determined that the JetBlue Proposal failed to satisfy the portion of the definition of "Superior Proposal" requiring it to be reasonably capable of consummation, and accordingly the Board did not form a view as to whether the economic terms of the JetBlue Proposal were or were not more favorable to Spirit Shareholders, from a financial point of view, than the economic terms of the Merger with Frontier.

45.    On May 2, 2022, Spirit sent a letter to JetBlue, which Spirit also released publicly, informing JetBlue that the Board had determined that the JetBlue Proposal did not constitute a "Superior Proposal" as defined in the Frontier Merger Agreement, on the grounds that it was not reasonably capable of being consummated, and that the Board continued to believe that the pending transaction with Frontier represented the best opportunity to maximize value for Spirit Shareholders.

46.    Notably, however, the Proxy concedes that Spirit and Frontier are experiencing regulatory pushback with respect to the Merger, and it does not appear that the JetBlue Proposal presents greater regulatory challenges than the Merger itself so as to offset the substantially superior economic terms for Spirit Shareholders of the JetBlue Proposal, i.e., $33.00 per share in cash versus $2.13 per share in cash and 1.9126 shares of Frontier common stock.

**The Proxy Contains Material Misrepresentations and Omissions**

47. Defendants disseminated a false and misleading Proxy to Spirit Shareholders that misrepresents material facts, and omits material facts necessary for Spirit Shareholders to make an informed decision concerning whether to vote for the Merger.

***Material Omissions Concerning the Overlap Between (i) Franke's Service as Chairman of the Spirit Board and Principal Ownership of Spirit, and (ii) the Service of Canfield and Defendants Christie, Gardner, Johnson, Jones, and Donaway on the Spirit Board and/or in Spirit Management***

48. As noted, the principal negotiators of the Merger on the Spirit side were Defendants Christie and Gardner, and Canfield (Spirit's General Counsel). Christie, Gardner and Canfield interacted primarily with Franke via multiple in-person meetings, phone calls and email exchanges to negotiate the material terms of the Merger, including the Merger Consideration, and post-close composition of the board of the combined company.

49. Gardner has been a member of the Board since July 2010, and replaced Franke as Chairman of the Board in August 2013; Christie has been a C-Suite executive at Spirit since April 2012; and Canfield has been Spirit's Senior Vice President and General Counsel since October 2007. Gardner, Christie and Canfield thus all served alongside Franke when, from July 2006 to August 2013, Franke was Chairman of the Spirit Board, and Indigo was one of Spirit's largest shareholders.

50. Moreover, Defendant Johnson has been a member of the Board since July 2010, Defendant Jones has been a member of the Board since 2006, and Defendant Donaway has been a member of the Board since January 2013. Thus, all three served on the Board alongside Franke when, from July 2006 to August 2013, Franke was Chairman of the Spirit Board, and Indigo was one of Spirit's largest shareholders.

51.     It emerges that the principal negotiators of the Merger on the Spirit side, and a majority of the Board that approved the Merger—*and rejected the JetBlue Proposal despite its substantially superior economic terms*—served alongside Franke when, from July 2006 to August 2013, Franke was Chairman of the Spirit Board, and Indigo was one of Spirit's largest shareholders.

52.     Further, after Franke left Spirit in August 2013, and became Chairman of the Board of Frontier in December 2013, the Proxy reflects that, between November 2016 and August 2018, Spirit and Frontier periodically explored the possibility of a business combination involving the two companies. Thus, after his departure from Spirit, Franke maintained his relationships with his former colleagues at Spirit.[1]

53.     These facts make it probable that Franke's relationships with the majority of the Spirit Board and principal negotiators of the Merger on the Spirit side—while he was the Chairman of the Spirit Board and one of the largest shareholders of Spirit, and after his departure from Spirit—influenced the negotiation of the Merger, and even more significantly, the Board's rejection of the JetBlue Proposal based on purported regulatory challenges that do not appear to differ materially from the regulatory challenges facing the Merger itself,  despite the JetBlue Proposal's substantially superior economic terms. Accordingly, the overlap between (i) Franke's tenure on the Spirit Board and substantial ownership of Spirit from July 2006 to August 2013, and (ii) the service of Canfield and Defendants Christie, Gardner, Johnson, Jones, and Donaway on the Spirit Board and/or in Spirit management, must be disclosed to Spirit Shareholders so they can

---

[1] The Proxy also recites that, on April 14, 2022, Christie and Franke had lunch together in Phoenix, Arizona, which purportedly had been scheduled in mid-March prior to the JetBlue Proposal, but purportedly did not discuss either the JetBlue Proposal or the Merger between Spirit and Frontier during their lunch. This lunch thus evidences a social relationship between Christie and Franke that extends beyond business matters.

decide for themselves how much weight to give the potential conflicts of interests arising from such past ties—and the ongoing relationship between Franke and the above Spirit executives and Board members after Franke's departure from Spirit—in connection with deciding how to vote with respect to the Merger.

***Material Omissions Concerning the Extent of the Business Relationship Between Barclays and Frontier***

54.     Concerning any prior relationships between Barclays and Frontier, the Proxy makes the following disclosure:

> Barclays has performed various investment banking services for Spirit and Frontier in the past, and may perform such services in the future, and has received, and would expect to receive, customary fees for such services. Specifically, in the past two years, Barclays has performed the following investment banking and financial services: (i) having acted as a joint bookrunner on Frontier's initial public offering in March 2021 . . . [and] (ix) having served as a lender under Frontier's pre-delivery deposit payments financing facility. During the period beginning January 1, 2020 through the date of rendering its opinion, the aggregate amount of fees that Barclays received from Spirit and ***Frontier*** for the investment banking and financial services described above was approximately $12.6 million ***and $5.5 million***, respectively.

55.     The statement above omits material facts that must be disclosed in order to make the statement not misleading. In particular, the Proxy fails to disclose that, *since 2003*, Barclays has served as Frontier's credit card partner, and currently manages Frontier's frequent flyer program via a Pre-Purchased Miles Facility.[2] As disclosed in the Prospectus filed by Frontier with the SEC on April 2, 2021, in connection with its IPO, in a section entitled "Description of Principal Indebtedness," the "Pre-Purchased Miles Facility" with Barclays constitutes a debt owed by Frontier to Barclays pursuant to which Frontier pays interest to Barclays, and Barclays apparently earns further profits from card members:

[2] See https://cards.barclaycardus.com/banking/cards/frontier-airlines-world-mastercard/

**Pre-Purchased Miles Facility**

We originally entered into an agreement with Barclays *in 2003* to provide for joint marketing, grant certain benefits to co-branded credit card holders ("Cardholders"), and allow Barclays to market using our customer database. Cardholders earn mileage credits under the Frontier Miles program and we sell mileage credits at agreed-upon rates to Barclays and earn fees from Barclays for the acquisition, retention and use of the co-branded credit card by consumers. In addition, Barclays will pre-purchase miles if we meet certain conditions precedent. During September 2020, we amended our agreements with Barclays to modify the products and services provided under the agreements, re-establish the pre-purchased miles facility and extend the term of the agreement to March 31, 2029. The dollar amount of the pre-purchased miles facility ("Facility Amount"), is subject to adjustment for the then-current year on each January 15, beginning on January 15, 2015 through and including January 15, 2028 based on the aggregate amount of fees payable by Barclays to us on a calendar year basis, *up to an aggregate maximum Facility Amount of $200 million*. Until we repay our CARES Act loans, however, we can only access up to $15 million of the Facility Amount. *We pay interest on the outstanding Facility Amount on a monthly basis based on a one-month LIBOR plus a margin.*

56.    Information that bears on whether a financial advisor faces conflicts of interest is material to stockholders when deciding how to vote on a merger. Here, because (i) Barclays played an active role in evaluating and negotiating the Merger, and (ii) the Board's decision to approve and recommend the Merger was based in part on Barclays's fairness opinion, any conflicts Barclays had that might have (i) predisposed it to favor Frontier in some manner, and (ii) prevented it from providing unbiased advice to the Board concerning the fairness of the Merger Consideration, would be material to the decision of Spirit Shareholders of whether to vote in favor of the Merger.

57.    To enable them to cast informed votes with respect to the Merger, Spirit Shareholders are entitled to disclosure of the Pre-Purchased Miles Facility to decide for themselves how much weight to give such information in connection with deciding how to vote with respect to the Merger.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class ("Class") consisting of all individuals and entities that were Spirit common shareholders of record as of the close of business on May 6, 2022 ("Class Period"), the record date ("Record Date") for Spirit common shareholders eligible to vote on the merger of Spirit and Frontier. Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

59.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

60.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, the Proxy discloses that, as of the Record Date, there were 108,618,703 shares of Spirit common stock outstanding eligible to vote. All members of the Class may be identified from records maintained by Spirit or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws specified above.

62.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests antagonistic to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in securities class action litigation of this nature.

63.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(i)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(ii)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(iii)   Whether Plaintiff and the other members of the Class are entitled to injunctive relief.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

65.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants
for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

66.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

67.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication

17

with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

68.     Defendants disseminated the false and misleading Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

69.     By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

70.     Yet, as specified in paragraphs 47-57 above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and (ii) omitted material facts from the Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Spirit Shareholders to vote in favor of the Merger and related proposals. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

71.     The material misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Spirit Shareholder would consider them important in deciding whether to vote in favor of the Merger and related proposals. In addition, a reasonable Spirit Shareholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to Spirit Shareholders.

72.     Because of the material misrepresentations and omissions in the Proxy specified above, Plaintiff and other Spirit Shareholders are threatened with irreparable harm insofar as

Plaintiff and other Spirit Shareholders will be deprived of their entitlement to cast informed votes with respect to the Merger if such material misrepresentations and omissions are not corrected before the Shareholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

**Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

73.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

74.     The Individual Defendants acted as controlling persons of Spirit within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Spirit, and participation in, and/or awareness of Spirit's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Spirit with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

75.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76.     Each of the Individual Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Board to

19

approve the Merger, and recommend that Spirit Shareholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

77.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval. The Individual Defendants thus directly participated in the drafting of the Proxy.

78.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

79.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

80.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict, and can Plaintiff and other Spirit Shareholders make an informed decision about whether to vote for the Merger.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Ordering that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative, and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Shareholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to Spirit Stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

C.     Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff rescissory damages;

D.     Directing Defendants to account to Plaintiff for all damages suffered as a result of their misconduct;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: May 13, 2022                                    **WOHL & FRUCHTER LLP**

                                                        By: /s Joshua E. Fruchter
                                                        Joshua E. Fruchter (JF2970)
                                                        25 Robert Pitt Drive, Suite 209G
                                                        Monsey, NY 10952
                                                        Tel: (845) 290-6818
                                                        Fax: (718) 504-3773
                                                        Email: jfruchter@wohlfruchter.com

                                                        *Attorneys for Plaintiff*